IN THE UNITED STATES DISTRICT COURT

**FILED**

**APR** 8 1997

FOR THE DISTRICT OF SOUTH CAROLINA

LARRY W. PROPES, CLERK
COLUMBIA, S. C.

COLUMBIA DIVISION

| | | |
|---|---|---|
| In Re Air Crash Disaster at Charlotte, | ) | |
| North Carolina on July 2, 1994 | ) | C/A No: 3:96-1117-17 |
| | ) | |
| RICHARD DEMARY | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **FINDINGS OF FACT,** |
| v. | ) | |
| | ) | **CONCLUSIONS OF LAW** |
| UNITED STATES OF AMERICA, | ) | |
| | ) | **AND ORDER** |
| Defendant. | ) | |

## INTRODUCTION

The present action was brought under the Federal Tort Claims Act ("FTCA"), 28 U.S.C.

§ 2671-80, by a surviving flight attendant who was on board USAir Flight 1016 when it crashed

on July 2, 1994, near the Charlotte Douglas International Airport. In this action, plaintiff, Richard

DeMary, seeks damages to compensate for physical and emotional injuries resulting from that

crash. Defendant does not contest the fact that plaintiff suffered serious injuries but does challenge

the full extent of these injuries and their likely duration. Plaintiff contends that the damages he

incurred from the crash approach $2 million; defendant's argument suggests damages more in the

range of $100,000 to $350,000.[1] For the reasons which follow, the court will award $569,821.42.

---

[1] In terms of lost future income, plaintiff argues that his damages are at least $573,863 and as
much as $787,706 while defendant argues that the more appropriate range is $63,046 to $244,349.
Although defendant did not suggest a specific proper amount of total damages, the relative argument
as to the extent of future lost earnings suggests to the court that defendant believes total damages

1

ENTERED & MAILED
4-8-97
GCH

Jurisdiction in this matter is vested in this court by 28 U.S.C. § 1346(b). Under the FTCA, the United States may be held liable for personal injury caused by the negligent act or omission of employees of the United States acting within the scope of their employment under the same circumstances where the United States, if a private person, could be responsible to the claimant in accordance with the law of the place where the act or omission occurred. 28 U.S.C. §§ 1346(b) & 2674.

The United States has admitted that its negligence was a proximate cause of the accident. Accordingly, the sole issue for trial was the amount and extent of compensable damages sustained by plaintiff.[2]

This action was tried to the court on December 2 through 4, 1996, in conjunction with the damages trial in the related case of Karen Forcht (C/A No.: 3:96-1118-17). Both cases involved injury to flight attendants in the same air disaster, with a principal element of damages in both cases being severe post traumatic stress disorder ("PTSD"). The evidence and witnesses in the two cases overlapped. At the request of all parties, therefore, the court allowed evidence in each case to be incorporated into the other to the extent relevant.

After hearing testimony, receiving evidence, reviewing the exhibits, reading briefs of counsel, and studying the applicable law, this court makes the following findings of fact and

---

should be between $100,000 and $350,000.

[2] Under North Carolina law, which both parties concede is applicable, the United States is jointly and severally liable with any other tortfeasor for plaintiff's damages. *See Price v. Seaboard Air Line R.R. Co.*, 161 S.E.2d 590, 599 (N.C. 1968). Plaintiff is, however, barred by the worker's compensation laws from bringing an action against his employer, USAir, for any negligence on its part in causing the crash.

2

conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. To the extent any findings of fact constitute conclusions of law, they are adopted as such: to the extent any conclusions of law constitute findings of fact, they are so adopted.

## FINDINGS OF FACT

Prior to filing this action, plaintiff properly complied with the requirements of 28 U.S.C. § 2675 with regard to the administrative claim procedure of the Federal Tort Claims Act. This court, therefore, has jurisdiction over the parties to, and the subject matter of, this action.

Plaintiff was a flight attendant with USAir on board USAir Flight 1016 when it crashed on July 2, 1994, near the Charlotte Douglas International Airport. Plaintiff was working on Flight 1016 and was acting within the course and scope of his employment with USAir when the crash occurred.

The United States has admitted that the negligence of its air traffic controllers was a proximate cause of this air disaster, which claimed the lives of thirty-seven people and injured twenty others including the plaintiff.

### General Background

At the time of this air disaster, Mr. DeMary was 32 years old. He had been a flight attendant for USAir for approximately two years, having worked for USAir in other capacities before becoming a flight attendant. As he put it, he caught the "travel bug" in the late 1980's, which led him to obtain a private pilot's license and begin a career with the airline.

By all accounts, Mr. DeMary thoroughly enjoyed his flight attendant career and took full advantage of the many opportunities it afforded him to travel within the country and overseas. His position as a flight attendant provided not only his career, but his social life. Among other things,

3

it afforded him the opportunity to visit his family frequently (about monthly), due to the significant time off between flights and the free travel. He felt the career to be perfect for him and expected to be a flight attendant for the rest of his life. He also gave frequent gifts of travel to family members, including his parents, who had not been able to travel before. He was able to do so because he could purchase tickets inexpensively as a fringe benefit of his employment.

Mr. DeMary was single but had previously been married from 1987 through 1993. Although his divorce was traumatic, he fully recovered from any emotional effects. Mr. DeMary had also dealt successfully with the tragic death of an older brother while Mr. DeMary was still in high school. Mr. DeMary's primary response to that loss was concern for his parents; he left college after only one year in part to return home to be with his parents. While he still feels the loss of his brother, it has not interfered with his ability to proceed with his life.

### The Crash

On the day of the crash, Mr. DeMary served as the senior flight attendant on the flight and was seated in the far forward area, just behind the cockpit. He recalls realizing that the "go around" did not sound right. He then felt a series of impacts, including the one that essentially severed the plane. He also recalls the plane sliding for an extremely long time. Mr. DeMary thought he was about to die.

When the plane came to a stop, Mr. DeMary realized he was being pelted by heavy rain. The plane had been severed in half not far aft of his position. Mr. DeMary removed his seat belt and, as he had been trained, began yelling instructions to the passengers to remove their belts and get out of the plane. Another flight attendant was seated next to Mr. DeMary. She could not stand due to a broken leg or knee. Mr. DeMary dragged her from the plane then returned to help others.

4

Ultimately, he helped several passengers out through breaks in the plane and assisted in rescuing a man trapped in the carport of a house, which had been struck by the plane. Throughout this time, Mr. DeMary was covered with fuel and feared that he would ignite because of the burning plane and debris.

Mr. DeMary cannot now fully recall portions of the events after the accident, although he told others of details at earlier times. This memory block appears to relate primarily to what he saw while going from one side of the severed plane to the other. Among the things he has previously recollected and described to others were charred bodies, and bodies with missing parts, including one or more decapitated bodies still strapped in their seats. These observations were considered by the various e perts in evaluating the degree of Mr. DeMary's emotional distress.

### Physical Injuries

Mr. DeMary was treated after the accident at Presbyterian Hospital in Charlotte for burns on his left arm and for a cut on his foot. He was given pain killers and crutches, which he used for about one week. He was not admitted to the hospital, but he was airlifted to Pittsburg four or five days later with fellow flight attendant Karen Forcht, who had been hospitalized.

Once in Pittsburg, Mr. DeMary was treated by Dr. I. William Goldfarb for burns. He continued to wear Jobst garments on his arm until November 1994 (approximately four months).[3]

The burns no longer cause pain, although plaintiff describes the pain of the initial

---

[3] Jobst garments or "Jobs skins" are a tight fitting covering worn to assist in the healing process for burns and to reduce scarring.

AO 72A
(Rev. 8/82)

debridement process as excruciating.[4]  Plaintiff does continue to have some pain in his foot if it is very cold or if he stands on it for a long time.

### Reaction To Accident/Emotional Injury

Mr. DeMary is quite obviously a man of substantial resolve and great committment to his family.  Despite a great degree of anxiety, he has forced himself to fly again.  He insists on flying to be with his family for holidays and important family events such as funerals and graduations.  He has flown to several awards ceremonies given in his honor (relating to his actions following the crash) and has also taken trips with his fiancée that required flying.

Since the disaster, Mr. DeMary has purchased a house that required repair and has spent significant time working on that house.  This work appears to be therapeutic and gives him some sense of purpose, although nothing near the satisfaction or enjoyment he would normally have achieved from his work as a flight attendant.

In addition, Mr. DeMary has returned to school and, through extraordinary effort, has been able to successfully complete several courses.  He is also now engaged to be married, but has serious concerns about his ability to provide for a wife, both financially and emotionally.  In part, this is because he is now exceptionally withdrawn and closed with his emotions.  Mr. DeMary's treating psycholigist confirmed that Mr. DeMary's emotional and other difficulties have caused relationship problems with his fiancée.

While Mr. DeMary has been able to regain some level of "normalcy," he is by no means the same person he was before the crash.  Instead of enjoying flying, he must prepare himself

---

[4]  Debridement is the process of removing dead skin and foreign or waste material from the burned area.  Various witnesses testified that it is normally a very painful process.

AO 72A
(Rev. 8/82)

mentally, a process that takes several hours, and he is extremely anxious throughout the flight. He will not fly if there is any sign of bad weather. If a plane encounters any turbulence while he is flying, he experiences a severe reaction that includes having his limbs go stiff, his heart "beat out of his chest," extreme fear, and a feeling that he needs to "crawl out of his skin."

Mr. DeMary has changed in numerous other ways. Before the accident, he frequently visited and played with his nieces and nephews, joking with them or pulling pranks. He flew out to help his father with projects. He took various family members, especially his parents, on interesting trips. By all accounts, he was happy, energetic, adventurous, caring and fun to be around. He was very open and involved with his extended family. The accident and resulting PTSD and depression have taken that from him. He deals with the trauma by suppressing his feelings, resulting in a basically "flat," withdrawn personality. He is anxious and irritable, with very little patience. While he still visits his family, neither he, nor they, are able to enjoy the visits as before.

Mr. DeMary describes himself now as seeing the world in black and white, whereas he used to see color. Life is now one-dimensional instead of three-dimensional. He feels pain instead of joy, sadness instead of happiness. He feels numb, as if he is just going through the motions of life. His self image has suffered as well; he now feels like "nothing," while he used to feel special and important. DeMary testified that he daily goes to bed and wakes up aching emotionally. The court's observations of Mr. DeMary at trial convince it that these descriptions of the changes in Mr. DeMary's life are accurate.

Despite the fact that Mr. DeMary has been recognized repeatedly and officially as "the hero of Flight 1016," he suffers tremendous feelings of guilt for not doing more to save the passengers.

7

For instance, he described images of the mother of a family killed in the crash coming to him daily asking why he did not save her children. Similarly, he agonizes over whether he turned on the aisle lights. The latter concern is not diminished either by the evidence that he did, in fact, flip the switch that would have activated the lights or the fact that this action could not have had any effect as the plane was essentially severed just aft of the switch. Both of these examples convince the court that Mr. DeMary's suffering is seriously exacerbated by feelings of guilt. That there is absolutely no reason for Mr. DeMary to feel this guilt does not alter the genuineness of the feelings.

Mr. DeMary has been seeing Dr. Cheryl D. Pierce, a psychologist, essentially weekly for over two years. She describes Mr. DeMary as suffering significant anxiety and frequent intrusive thoughts of the crash. He also suffers from feelings of guilt and a belief in a foreshortened future, that is, that something terrible will happen to him in the near future. Mr. DeMary has reacted to the crash with a restricted emotional range, withdrawal, and difficulty communicating with others. He is depressed, irritable, and experiences outbursts of anger. His symptoms also include a low tolerance for frustration; difficulty in his personal relationships; and a fear of abandonment by his fiancée.

Dr. Pierce has concluded that plaintiff suffers from post traumatic stress disorder with depression.[5] She believes Mr. DeMary's emotional numbing is his way of coping with the disaster. Mr. DeMary evidences an extreme suppression of feelings and emotions. He also experiences very conflicting feelings about the disaster and this litigation. For instance, he sees his actions after the

---

[5] As discussed below, defendant does not challenge the fact that Mr. DeMary suffers PTSD with depression. Defendant's challenge is to the current level of severity and the likelihood of near full recovery in the future.

8

AO 72A
(Rev. 8/82)

crash simply as doing his duty and, therefore, finds it disturbing to be seen as a hero and to be given awards. Although Mr. DeMary feels very damaged by the accident, he nonetheless feels conflicted about pursuing litigation.

In the time that she has been treating Mr. DeMary, Dr. Pierce has seen some improvement in his condition. Among the positive signs are his ability to form a serious relationship, his perserverance in repairing his home, his decision to return to school and build from one or two courses to a full course load (four courses), and his ability to achieve better grades than in the past. She acknowledges, however, that these fairly normal achievements require an extraordinary effort.

Dr. Pierce believes plaintiff will be able to return to work in one to two years. It is, however, most unlikely he will ever be able to return to the position of flight attendant. Dr. Pierce believes any failure in a return to work would exacerbate present feelings of failure. The very fact that he has not yet "gotten well" causes Mr. DeMary further feelings of failure.

Dr. Pierce's greatest concern is for Mr. DeMary's full emotional healing. Her opinion is guarded that he will ever feel like a fully whole person again.

Mr. DeMary himself has not given up hope of returning to a career as a flight attendant some day, and retains that as his goal. Nonetheless, he realizes this is more of a dream than a realistic goal. He has also considered other positions with USAir and has spoken with his former supervisor regarding the possibility. No specific offers have been extended to Mr. DeMary and, for reasons stated below, he is clearly not yet fully able to return to any position. While remaining a possibilty, more likely than not, he will never be a flight attendant again.

Plaintiff offered Paul Nassar, M.D. as an expert in the field of Psychiatry. Dr. Nassar examined Mr. DeMary by interviewing him and administering various tests. Dr. Nassar also

9

reviewed the medical records and Dr. Pierce's notes.

Dr. Nassar concluded that plaintiff suffers from post traumatic stress disorder. He agreed with Dr. Pierce that this is evidenced in plaintiff's case by a flat emotional effect, in essence a "numbing" of the person. Dr. Nassar compared the reactions of the two flight attendants whose cases were before the court. Ms. Forcht reacted with overloaded, or continuously flooded, emotions, while Mr. DeMary reacted with a repression of emotion, with very little getting through. Dr. Nassar explained that such opposite reactions are simply different ways that different people exhibit PTSD.

In regard to employability, Dr. Nassar felt that Mr. DeMary would seek safety in future job choices. DeMary's present coping methods indicate a limited employability at this time. For instance, he is able to learn his course material only through an unusually high degree of repetitition, and he can only study in places with no distractions due to a diminished ability to concentrate. Similarly, plaintiff has been able to make himself fly, but he limits flights to ideal weather conditions and must spend a significant degree of time in relaxation techniques before each flight. These special coping methods consume a tremendous degree of energy, which would reduce any productivity or ability to cope on the job.

Over time, Dr. Nassar believes plaintiff's earning ability will be reduced by twenty-five to fifty percent (25 to 50%) because of job limitations imposed by his PTSD, most particularly, his willingness and emotional ability to take risks. Dr. Nassar believes that plaintiff will be able to return to full employment in five to ten years.

Defendant offered Dr. John P. Wilson, a well-recognized expert in the field of psychology who has conducted significant study in relation to PTSD. Dr. Wilson agreed that Mr. DeMary

10

suffers chronic PTSD and depression as a result of the crash. Dr. Wilson saw gradual improvement in plaintiff's condition as evidenced by his ability to work on a home, form a new personal relationship, and succeed academically. He believed plaintiff would continue to need treatment for PTSD, and should consider the use of medications, which plaintiff has rejected to this point.

Although his conclusions were otherwise very similar to plaintiff's experts, Dr. Wilson was more optomistic as to plaintiff's future. Dr. Wilson believes plaintiff's condition will resolve with proper treatment and that Mr. DeMary will, ultimately, be able to function fully. Dr. Wilson also believes Mr. DeMary is presently able to work without significant limitations. Indeed, Dr. Wilson believed that a return to work would be therapeutic. He agreed, however, that plaintiff could not presently perform as a flight attendant because he still exhibits PTSD symptoms. He nonetheless felt there was a good probability plaintiff would be able to return to this form of work in the future, possibly with another two years of treatment.

Factors in plaintiff's favor for recovery, in Dr. Wilson's view, included his ability to deal well with and recover from his brother's death, as well as his strong work ethic, drive, and goal orientation. Dr. Wilson also felt plaintiff's level of education and decision to return to school were positive factors, as was his ability to make significant repairs to his own home and his return to flying. In addition, plaintiff's supporting family and fiancée were positive factors.

Dr. Wilson conceded that the PTSD injury was, nonetheless, a permanent injury, a "scar on the soul," and that plaintiff would never again be the person he was before the disaster. He will spend the rest of his life "coping" with his loss. Dr. Wilson believes proper treatment will be a struggle with each visit, but should result in acquisition of good coping skills and the ultimate integration of the disaster into plaintiff's life story so that he sees himself as a survivor rather than

11

a victim.

Dr. Wilson also acknowledges that plaintiff will continue to be more vulnerable than the average person to negative events. He may suffer relapses as a result of traumatic or negative events in his life. Neither the severity nor the length of any relapse can be predicted at this time. Any one of a number of unknowns could impair plaintiff's prospects of full recovery. Nonetheless, Dr. Wilson maintains that more likely than not plaintiff will recover fully in two years.

Mr. DeMary was also evaluated by Dr. William W. Stewart, a vocational expert called by plaintiff. Dr. Stewart met with Mr. DeMary twice and spoke with him by phone on more than one occassion. Dr. Stewart evaluated plaintiff by interviewing him, by administering a number of tests, and by reviewing various records.

Dr. Stewart considered the following factors in addressing plaintiff's present employability. Educationally, plaintiff holds a high school degree, has a little over one year of college, and is presently enrolled in classes. He has been unemployed for two and one half years. He suffers only minor continuing physical effects from the air disaster (some intermitent pain in the feet) that might impose some minor limitations on employment. Plaintiff also continues to suffer a loss of self esteem and a fear of catastrophic injury, as well as other significant PTSD symptoms. Due to his present emotional condition, Mr. DeMary avoids contact with other people and especially avoids conflict situations.

In terms of job history, Dr. Stewart considered that DeMary has served as a customer service agent, in addition to serving as a flight attendant. He has been involved in the loading and servicing of planes. He has worked in a variety of positions, including management, with a number of retail and food service industries.

12

Dr. Stewart observed that plaintiff is presently impaired in his ability to concentrate, needing to reread material and have questions or instructions repeated. Plaintiff exhibited a healthy but unfocused interest profile, with particular interest in service fields such as teaching or counseling. In a life situation survey administered by Dr. Stewart, plaintiff scored an overal sixty-nine (69) on a scale of zero to one hundred (0 to 100), indicating a fairly poor quality of life. In a depression inventory, plaintiff exhibited moderate to severe depression, indicating the need for intensive psychological treatment.

Based on the above information, Dr. Stewart concluded that Mr. DeMary is not currently job ready and would be best served, long term, by remaining in school. Ultimately, he felt plaintiff could return to a variety of occupations including customer service representative with the airline, inventory controller, or teacher. Nonetheless, Dr. Stewart considered the job prospects somewhat guarded due to problems with hiring bias against persons with long breaks in their work history or prior emotional difficulties.

Ultimately, Dr. Stewart believes plaintiff will suffer a fifty to seventy-five percent impairment in his overall lifetime earning capacity. Even with additional education, the loss of time from the work force and the need to change careers will have a significant long term effect. Dr. Stewart's ultimate conclusion was that a fifty percent reduction was the most probable result, with possible reduction ranging to as much as seventy-five percent.

Plaintiff offered Dr. Oliver Wood as an expert economist to predict the level of plaintiff's economic losses based on the testimony of the above experts. Dr. Wood based his calculations on a life expectancy of 41.41 additional years after the crash (to age 73.36) and an assumption that plaintiff would work to his Social Security retirement age of 67. Using plaintiff's average flight

13

hours and status (*e.g.* enhancements for night pay and lead flight attendant) for the year before the crash, and schedules for future pay raises set out in existing union contracts, with various adjustments for taxes and benefits lost and gained, Dr. Wood concluded that DeMary would suffer lifetime post-trial losses of income between $420,283 (if his loss was 50%) to $634,126 (if his loss was 75%). Both figures represent present value. In addition, Dr. Woods calculated lost health benefits (including dental) at $90,662, and lost life insurance benefits at $3,342. The present value of lost free air travel was estimated at $59,576. Thus, the present value of the net loss ranged from $573,863 if plaintiff suffered a 50% loss of income to $787,706 if he suffered a 75% loss of lifetime income.

By contrast, defendant's expert economist, Dr. J. Buehler, estimated a somewhat earlier retirement age of 62.7, in the absence of the crash, based on 1986 work life expectancy tables published by the Department of Labor. Dr. Wood rejected this testimony, as does the court, because it ignores changes in social security retirement age and other demographic changes since 1986 and likely to continue into the future. Based on this presumption, Dr. Buehler projected losses under two scenarios. The first scenario presumes plaintiff will remain in college for two years then return to work for USAir as a flight attendant with no loss in seniority. Under this scenario, Dr. Buehler projected losses of $63,046. The second scenario presumes Mr. DeMary will complete a degree in three years then enter a new field securing a salary similar to that of most new college graduates. Dr. Buehler further presumes plaintiff's career will proceed as if plaintiff were the average college graduate. Under this scenario, Dr. Buehler estimated losses of $244,349.

While the court does not adopt either experts' views in total, the court finds Dr. Wood's projections to be the more persuasive. Dr. Buehler's calculations are based on presumptions that

14

ignore the strong probability of at least some long-term residual problem related to the PTSD, which is likely to affect and limit career options. Likewise, Dr. Buehler ignores the probable long-term impact of plaintiff's absence from the work force.

The court notes, however, that although plaintiff's and defendant's experts varied significantly in their basic assumptions, their methodologies of calculating losses were very similar. Having reviewed all of the evidence, the court makes the following findings regarding the proper assumptions to be made:

The court finds that had the crash not cut short his flight attendant career, Mr. DeMary would have continued in this position or changed to another position with similar earning capacity relative to the years of service until age 65. This would result in expected remaining lifetime earnings of $1,078,862 (present value including benefits) but for the accident. Due to the disaster, plaintiff has been unemployed and remains only marginally employable at the present time. His lost pretrial earnings are as stipulated $49,116.42. Plaintiff will likely maximize his future earning capacity if he remains in college full-time and continues to receive treatment from Dr. Pierce until after his college degree is completed. At that time, plaintiff should be able to return to the work force in a new career position. Unfortunately, given the loss of time from the job market and the limits imposed by his PTSD, more likely than not he will return to the work force with a reduced earning capacity relative to his earning capacity at the same time had this disaster not so severely affected his life. The court further concludes that he will suffer continuing effects of PTSD which, combined with the effect of the loss of time from the work place and career change, will more likely than not cause plaintiff to suffer a lifetime reduction in earning capacity of twenty-five percent

15

(25%) translating into present dollar losses of $269,715.[6]

## QUANTIFICATION OF DAMAGES

**Medical and Counseling Expenses:**

Plaintiff does not seek recovery for medical or counseling expenses incurred from the time of the crash until the trial. He does, however, seek to recover the expenses of continued treatment of the PTSD and related symptoms.

The court concludes that plaintiff will need long term continued treatment to aid in his recovery. Plaintiff will continue to need routine sessions with the treating psychologist on a weekly basis in the near future, decreasing to monthly and, eventually, to rarely although possibly having some need, off and on, for the remainder of his life. At the rate of $90 per hour in current dollars,[7] the court concludes that plaintiff is entitled to $22,440 dollars in damages to compensate for these future medical expenses.[8]

In addition, a certain degree of oversight by a physician trained in psychiatry is likely to be necessary. The court concludes that such oversight would average at least one to two visits annually

---

[6] At the conclusion of oral argument in this case, both parties agreed that the court need not recite in its order its analysis of the individual factors and calculations that resulted in the court's final determination of lost future earnings. Therefore, while the court has considered all the factors discussed by the experts and in the conclusions of law contained in this order, that analysis is not repeated here.

[7] The court has presumed that the inflationary factor will be balanced out by reduction to present value and has, therefore, used the current dollar value as an approximation of the future medical cost, reduced to present value.

[8] This figure is arrived at as follows:

| | | |
|---|---|---|
| Six years averaging twice monthly visits @ $90 | = | 12,960 |
| Six years averaging monthly visits @ $90 | = | 6,480 |
| Remainder of life | = | 3,000 |
| Total | | $22,440 |

16

for the next several years with sporadic visits therafter. Given a thirty-nine year remaining life expectancy, the court concludes that, more likely than not, this would total forty-five visits. At the current rate of $190 dollars, the psychiatric visits would total $8,550. Therefore, probable total future medical expenses total $30,990.

**Pain and Suffering:**

Quantifying the pain and suffering experienced by a personal injury plaintiff is difficult in the best of circumstances. This difficulty is exacerbated in the instant case by two factors. First, the most significant pain and suffering in the present case is severe emotional suffering over the more than two year period since the time of the crash. Second, while no one disputes that the post traumatic stress syndrome that plaintiff has suffered will remain with him for the rest of his life, there are significant questions as to the degree to which the plaintiff will be able to learn to cope with this trauma.

The court concludes that plaintiff will recover in significant ways over time. Nevertheless, the emotional suffering will obviously continue to be a significant factor for the forseeable future, and permanent emotional injuries will remain. While plaintiff is already learning coping skills and appears to have reduced his anguish associated with the crash, a degree of suffering will persist with exacerbations or relapses from time to time throughout the remainder of his life. Moreover, the emotional suffering plaintiff has endured has quite obviously been severely limiting, even debilitating at times, and has severely affected plaintiff since the date of the crash.

This court is constrained to note that it approached plaintiffs' claims of debilitating emotional injury in this and the related case of Karen Forcht with a significant degree of skepticism. Claims of long-term debilitating emotional injury are frequently asserted in a variety of tort actions, but

17

seldom proved to this court's or a jury's satisfaction. This is not to say that some degree of distress is not proven with some frequency, but truly severe and debilitating distress is very rarely proven. Here, although the court was well aware of the great trauma that all survivors of the crash must have experienced, the court was far from predisposed to presume debilitating emotional injury. This was particularly true for these two plaintiffs because they were trained flight attendants, presumably better prepared to survive any crash without long term emotional distress.

However, after observing these plaintiffs, hearing their testimony as well as the testimony of numerous experts, including defendant's expert who specializes in the study and treatment of PTSD, the court cannot help but conclude that these two individuals have been severely and permanently injured. Moreover, the court is convinced — despite its initial skepticism — that these plaintiffs' injuries have been exacerbated, rather than decreased or avoided, by their unique positions as flight attendants. This is because of their special feelings of responsibility to protect their passengers, and the associated guilt for failing to do so, even though there was, in reality, nothing further either of them could have done.

This is not to say that the court has found equal injury as between these two flight attendants. While both have been severely injured, those injuries are not the same, both because of the different characteristics of these individuals and because of differences in their crash experiences. Further, they have responded to the injuries in different ways, which will more likely result in differences in their long term recoveries.

That Mr. DeMary has been able to accomplish certain "normal" life functions does not diminish the pain obviously suffered. Certainly, the court has considered plaintiff's achievements, in determining that plaintiff is not totally disabled from all of life's functions. The accomplishment

18

AO 72A
(Rev. 8/82)

of these normal activities does not lessen plaintiff's strong proof of significant ongoing emotional suffering. Based on the foregoing, the court awards $220,000 for pain and suffering due to the emotional and physical injuries which plaintiff sustained as a result of the crash.

**Total Damages:**

The court finds that plaintiff sustained damages as follows:

Medical expenses

| | |
|---|---|
| Prior to trial -- | None sought |
| Anticipated future expenses | $ 30,990.00 |
| Pain and suffering | $220,000.00 |
| Loss of income before trial (stipulated amount) | $ 49,116.42 |
| Probable loss of future income | $269,715.00 |
| TOTAL ACTUAL DAMAGES | $569,821.42 |

## CONCLUSIONS OF LAW

Because the United States has conceded liability, the applicable law in this case is the relevant law of damages. Under the Federal Tort Claims Act, the court sets damages under the law of the place where the complained of act or omission occurred. *Richards v. Unites States,* 369 U.S. 1 (1962). Neither party disputes that the substantive tort law of North Carolina applies to these cases.

Two damages limitations under the FTCA are applicable in this case. First, plaintiff may recover only compensatory damages as allowed by state law; punitive damages may not be recovered. *See* 28 U.S.C. § 2674. Second, no pre-judgment interest may be recovered in an FTCA action. Plaintiff has not sought either in this case.

19

Under North Carolina law, a plaintiff may recover the present worth of all damages that naturally flow from the defendant's conduct. *King v. Britt,* 148 S.E.2d 594, 597 (N.C.1966). Specifically, under North Carolina law, a personal injury plaintiff may recover damages for pecuniary loss and expenses, loss or diminution of earnings during incapacity, impairment of future earning capacity, and pain and suffering, including mental suffering. *See United States v. Brooks,* 176 F.2d 482, 483-84 (4th Cir. 1949). This court's factual determination of the amounts of these damages are set forth above.

As the Fourth Circuit has recently repeated, compensatory damage awards should be "proportional to the actual injury incurred" and "must focus on the real injury sustained." *Hetzel v. County of Prince William,* 89 F.3d 169, 173 (4th Cir. 1996) (reversing $500,000 emotional distress award in a discrimination case as grossly excessive and suggesting $9,000-$15,000 as a more appropriate award because plaintiff suffered no physical injury other than headaches, stress, difficulty reading, and family problems; continued to work with no noticeable reduction in performance; and never saw a doctor or therapist for the claimed emotional distress).

North Carolina courts recognize that the damages awarded should have the goal of restoring injured persons as nearly as possible to the position they would have been in but for the defendant's negligence. *See Jacobs v. Central Transport, Inc.,* 891 F. Supp. 1120 (E.D.N.C. 1995). Plaintiffs must, however, act to mitigate their damages. *See Smith v. Childs,* 437 S.E.2d 500, 507 (N.C. App. 1993) ("Plaintiff is barred from recovering for those losses which could have been prevented through the plaintiff's reasonable efforts."). In determining whether a plaintiff has failed to mitigate damages, the court can consider whether that person has failed to follow the advice of their physician or other treating professional. *E.g. Snead v. Holloman,* 400 S.E.2d 91, 93 (N.C. App.

20

Under North Carolina law, a plaintiff may recover the present worth of all damages that naturally flow from the defendant's conduct. *King v. Britt,* 148 S.E.2d 594, 597 (N.C.1966). Specifically, under North Carolina law, a personal injury plaintiff may recover damages for pecuniary loss and expenses, loss or diminution of earnings during incapacity, impairment of future earning capacity, and pain and suffering, including mental suffering. *See United States v. Brooks,* 176 F.2d 482, 483-84 (4th Cir. 1949). This court's factual determination of the amounts of these damages are set forth above.

As the Fourth Circuit has recently repeated, compensatory damage awards should be "proportional to the actual injury incurred" and "must focus on the real injury sustained." *Hetzel v. County of Prince William,* 89 F.3d 169, 173 (4th Cir. 1996) (reversing $500,000 emotional distress award in a discrimination case as grossly excessive and suggesting $9,000-$15,000 as a more appropriate award because plaintiff suffered no physical injury other than headaches, stress, difficulty reading, and family problems; continued to work with no noticeable reduction in performance; and never saw a doctor or therapist for the claimed emotional distress).

North Carolina courts recognize that the damages awarded should have the goal of restoring injured persons as nearly as possible to the position they would have been in but for the defendant's negligence. *See Jacobs v. Central Transport, Inc.,* 891 F. Supp. 1120 (E.D.N.C. 1995). Plaintiffs must, however, act to mitigate their damages. *See Smith v. Childs,* 437 S.E.2d 500, 507 (N.C. App. 1993) ("Plaintiff is barred from recovering for those losses which could have been prevented through the plaintiff's reasonable efforts."). In determining whether a plaintiff has failed to mitigate damages, the court can consider whether that person has failed to follow the advice of their physician or other treating professional. *E.g. Snead v. Holloman,* 400 S.E.2d 91, 93 (N.C. App.

20

1991).

The court has taken these factors into account in reaching its above stated award. In particular, the court finds that Mr. DeMary's choice not to take antidepressant medications is not a wholly unreasonable choice. He has, instead, made major efforts in other ways and obviously declined the reliance on medication based on the same attitude of self-reliance and determination that have brought him this far in his recovery. Therefore, the court does not find this personal choice to be a failure to mitigate damages under the present circumstances.

In addition, in calculating damages under North Carolina law, the court should consider the effect of income taxes. *Livingston v. United States,* 817 F. Supp. 601, 605 (E.D.N.C. 1993). Further, all damages, including amounts awarded for non-economic damages, such as pain and suffering, must be reduced to present value. *King v. Britt,* 148 S.E.2d 594, 598 (N.C.1966).

In considering the amount of the award in this case, this court has considered a variety of cases suggested by the United States as providing guidance of the amount of damages. For instance, in three cases offered, damages ranged from $12,500 to $100,000 for physical injuries that resulted in permanent impairments or scarring and a significant degree of pain and painful medical procedures. *Jones v. Hughes,* 429 S.E.2d 399, *cert. denied,* 436 S.E.2d 378 (1993) ($100,000 awarded in addition to medical expenses for permanent dental injuries that required numerous, painful dental procedures and for injury to leg, both requiring hospitalization for twenty-four days and that left permanent scarring and disfigurement); *Ferrell v. Frye,* 424 S.E.2d 197 (N.C. App. 1993)($12,500 awarded for permanent injuries suffered in performance of duties, which included injuries to neck and shoulder leading to persistent pain daily headaches); *Kremer v. Food Lion, Inc.,* 401 S.E.2d 837 (N.C. App. 1991) ($90,000 awarded for injuries resulting from fall, which included

21

a hip fracture resulting in 20% partial permanent disability to right leg). While at least two of these cases present physical injuries with resulting physical pain and suffering that might even exceed that associated with the physical injuries of the present plaintiff, they are of little guidance as to the very significant emotional injuries in the present case.

Defendant also directs the court to *Musick v. United States,* 781 F. Supp. 445 (W.D. Va. 1991), a Federal Tort Claims Act case involving a head injury and multiple contusions which caused, among other things, Post Traumatic Stress Disorder. The fifty-seven year old plaintiff in *Musick* suffered permanent hearing loss, numbness in lower extremities and a personality change characterized by marital paranoia and severe personal neglect. The court in that case awarded medical expenses plus $120,000 for bodily injuries and $100,000 for pain and suffering. Although this award includes recovery for PTSD, the level of PTSD injury and the percentage of the award attributable to PTSD injuries appear to this court to be far less significant than in the present case. *See also Hardison v. Ferebee,* CVS 1160 (N.C. Super. Ct. 1993) (awarding $125,000 to woman suffering PTSD, an eating disorder, fecal incontinence, and paranoia as a result of being stalked and harrassed for years by a male).

The court is not, however, persuaded that the damages awarded in the cases cited by defendant are particularly instructive here. This is primarily because damages for emotional distress are perhaps the most difficult damages to quantify. They are unique to each plaintiff, requiring careful inquiry into the event experienced, the plaintiff's reaction to those events, and the plaintiff's prospects for recovery. They, therefore, vary widely and can only be determined after

22

a careful but necessarily subjective analysis by the finder of fact.[9]  Here, the indescribable horror

---

[9]  In contrast to the verdicts cited by defendant, this court has located numerous verdicts with significantly higher awards in cases in which emotional distress injuries made up a significant portion of the damages.  *See Havinga v. Crowley Towing and Transp. Co.,* 24 F.3d 1480 (1st Cir. 1994) (affirming awards of $200,000 to $450,000 each for emotional pain and suffering of five sailors who were stranded in rubber life boat in shark infested waters for four and one half hours after their ship sank as a result of a collision); *Schneider v. National Railroad Passenger Corporation,* 987 F.2d 132 (2d Cir. 1993) (finding that jury verdict of $1.75 million awarded to railroad employee in FELA case was not excessive recovery for physical and emotional distress (PTSD) injuries that resulted from a brutal attack that occurred when the employee was leaving work); *Kukla v. Syfus Leasing Co.,* 928 F. Supp 1328 (S.D.N.Y. 1996) (refusing to set aside jury award of $750,000 for past pain and suffering plus $600,000 for future pain and suffering awarded to rape victim, largely for emotional distress damages (PTSD)); *see also Sosa v. Jefferson County,* No. C-95-229 (W.D.Ky. March 1, 1996) (jury award of $1.18 million in damages including $150,000 punitive damages in Section 1983 case against Department of Corrections officials for mistreatment of arrestee because he had AIDS and was of Latin American descent -- the damage award apparently related solely to emotional distress injuries with limited direct economic losses resulting from those injuries as plaintiff was unemployed at the time of his arrest); *Lucas v. J.C. Penney Co.,* No. C93-1840C (W.D. Wash. Jan. 17, 1996) (jury award of $1.5 million in hostile environment employment discrimination case where 56 year old plaintiff was forced into early retirement by management's inappropriate response to coworker's continuing use of racial slurs and threats of violence -- although the award is apparently largely attributable to emotional distress injuries, it includes some unsegregated economic losses); *Bishop v. CMI Corp.,* No. CIV-94-2054-L (W.D. Okla. Nov. 20, 1995)(awarding $1 million in damages, including $250,000 for mental distress damages in wrongful termination case when plaintiff had worked for the employer only a short time; was fired because of a disability characterized by involuntary tics, jerks, and other body motions; and was rehired after filing a discrimination complaint); *Hall v. Power,* No. 91-1519 CA 03 (Fla. Cir. Ct. Nov. 13, 1995) (awarding $2.08 million in damages for wrongful denial of insurance coverage to woman who later died after being denied treatment at various facilities for her cancer -- the award included $500,000 in emotional distress damages each to the cancer victim's estate and her husband); *Giraldo v. United States,* CV No. 91-0133 (E.D.N.Y. July 7, 1995) (awarding total damages of $2.12 million against the government in an FTCA case, including $1.2 million for past pain and suffering, $200,000 for future pain and suffering, $298,000 for future medical care, and $417,000 for loss of future earnings capacity in airline crash case causing severe physical injuries and PTSD with depression which, coupled with physical injuries to plaintiff's hands, would limit plaintiff's future employability, particularly in his chosen field as an aspiring professional musician). This court has not relied on these awards to determine its present award, indeed, this court has not determined the later history of the various unreported cases.  Rather, these cases are referred to here simply to demonstrate the broad range of damages that have been awarded for emotional distress injuries. This court is also intimately familiar with the details of settlements in many other personal injury actions arising out of the crash of USAir Flight 1016, having presided over numerous settlement approval hearings, and having successfully mediated some of the other cases.  Although it plays no part in the court's decision-making process in the present case, the court observes that the award in this case is not out of line with amounts received by other injured passengers relative to the

23

of the event that plaintiff constantly relives, the associated survivor guilt, and the continuing severe impact on plaintiff's daily life dictate an award dissimilar to that in the cases cited by defendant.

The court has also considered defendant's argument that the plaintiff received training to deal with the type of event occurred. That is, plaintiff was trained to assist passengers in the event of a crash. This training included certain simulations, including being in a smoke filled cabin.

While this training might well prepare flight attendants for the possibility of a crash, and thereby increase their ability to help passengers, it would be unlikely to prepare a flight attendant for the horrors witnessed here. This was a catastrophic crash that literally ripped the plane into two pieces scattering bodies and body parts, and destroying the majority of the passenger section. The crash was accompanied by explosions that severely burned passengers leaving charred and dismembered bodies to which this attendant was exposed. These bodies included those of small children and passengers recently seated by this attendant.

It is obvious that this flight attendant experienced (and continues to experience) extreme feelings of guilt because he was responsible, to the extent possible, for the safe exit of passengers in the event of the crash. The court is quite convinced that these feelings of guilt are genuine and deep, despite the fact that this flight attendant could have done nothing further to assist the passengers under these catastrophic circumstances.

Therefore, the court may agree that a flight attendant understands that due to their frequency of travel they are at a greater risk of being in a crash. The court may also agree that the attendant understands and assumes special duties for the safety of others in the event of a crash. The

---

severity of the injuries suffered.

24

attendant's state of knowledge might well better prepare them to survive at least some crashes without as severe an emotional impact as the average passenger. Even accepting these propositions, however, the court cannot see how this provides any defense or reason to reduce damages for injuries which have, in fact, occurred.

Certainly, plaintiff cannot be said to have assumed the risk of this catastrophic crash, which would bar recovery altogether. The court is aware of no other doctrine or legal authority for reducing recovery simply because a person was aware of a possible risk of their occupation.

## CONCLUSION

Based on the forgoing analysis, the court finds that the plaintiff is entitled to a verdict against the defendant for the above stated actual damages sustained by the plaintiff as a result of the crash of USAir Flight 1016 on July 2, 1994.

### TOTAL ACTUAL DAMAGES

The Clerk of Court is hereby directed to enter judgment in favor of the plaintiff against the defendant in the amount of $569,821.42.

IT IS SO ORDERED

Joseph F. Anderson, Jr.
United States District Judge

April 8, 1997
Columbia, South Carolina

25

AO 72A
(Rev. 8/82)